Matthew Borden, Esq. (SBN: 214323)
  borden@braunhagey.com
J. Noah Hagey, Esq. (SBN: 262331)
  hagey@braunhagey.com
Clint Christoffersen, Esq. (SBN: 315827)
  christoffersen@braunhagey.com
Hannah Stitt, Esq. (SBN: 309349)
  stitt@braunhagey.com
BRAUNHAGEY & BORDEN LLP
220 Sansome Street, Second Floor
San Francisco, CA 94104
Telephone:  (415) 599-0210
Facsimile:  (415) 276-1808

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFONIA

| | |
|---|---|
| KAREN MOU, ANITA WILLIS, on behalf of themselves and those similarly situated,<br><br>             Plaintiffs,<br><br>        v.<br><br>SSC SAN JOSE OPERATING COMPANY LP, SSC PITTSBURG OPERATING COMPANY LP, SSC OAKLAND EXCELL OPERATING COMPANY LP, SSC NEWPORT BEACH OPERATING COMPANY LP, SSC CARMICHAEL OPERATING COMPANY LP, SSC TARZANA OPERATING COMPANY LP, SAVASENIORCARE, LLC, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVASENIORCARE CONSULTING, LLC, SSC DISBURSEMENT COMPANY, LLC, AND DOES 1-10,<br><br>             Defendants. | Case No. 5:18-cv-01911-EJD<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATION OF RESIDENT RIGHTS, HEALTH & SAFETY CODE § 1430(b), AND BUSINESS & PROFESSIONS CODE §§ 17200,** *et seq.*<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

Plaintiffs Karen Mou and Anita Willis, on behalf of themselves and those similarly situated, allege as follows:

## INTRODUCTION

1.     Plaintiffs Karen Mou and Anita Willis were illegally discharged from Courtyard Care Center, a skilled nursing facility in San Jose, California.

2.     Ms. Willis was not medically cleared to leave.  She was admitted after a serious brain injury and suffered from other severe morbidities.  At the time she was discharged, she was disoriented and had substantial difficulty walking.  After Courtyard Care kicked her out, she went to a motel.  Two days later, she could no longer pay for the motel and became homeless.  A few days later, she suffered internal bleeding and was rushed into emergency life-saving surgery.

3.     Ms. Mou, also, was not seen by a doctor before Courtyard Care evicted her without notice.  She was admitted after being run over by a car as a pedestrian.  She suffered multiple fractures to her vertebrae, upper and lower leg, and sternum.  Her liver and kidneys were also damaged.  She was then required to have heart surgery.  She was unable to walk and unable to take care of herself without skilled nursing assistance.

4.     Courtyard Care's reasons for discharging Plaintiffs were purely monetary; they had nothing to do with whether Plaintiffs were fit to leave, or whether Courtyard Care had complied with any of the statutory discharge procedures that protect nursing home residents.

5.     Defendants' mistreatment of Plaintiffs is a common business practice known as "dumping," which skilled nursing facilities use to summarily get rid of their poorest and neediest residents to make room for more lucrative clients.  This practice is illegal.  *St. John of God Retirement & Care Ctr. v. Dep't of Health Care Servs. Office*, 2 Cal. App. 5th 638, 653-57 (2016).

6.     Before a facility may evict a resident, it must, *inter alia*, provide 30-days' written notice, have a doctor document all the reasons for the discharge in the medical record, engage in extensive discharge planning which includes helping the resident locate and become admitted to a new care facility, prepare and orient the resident for transfer, and notify the local ombudsman whose job it is to advocate for the resident and inform the resident of her rights.  42 U.S.C. § 1395i-3(c)(2)(B), (C); 42 C.F.R. § 483.15.  The resident must also be permitted to challenge the decision

through an administrative proceeding and eventually through the courts.  These procedures exist to protect against dangerous, unfounded and hasty discharges – *i.e.*, exactly what Defendants did to Ms. Willis and Ms. Mou.

7.      Courtyard Care deliberately discharged Ms. Mou and Ms. Willis without notice, without informing them of their rights and without notifying the Ombudsman, so that they would remain unaware of their respective rights to appeal the facility's decisions to evict them, and to remain living at the facility while they did so.  This was nothing new.  Courtyard Care has testified under oath that it has a policy of never issuing discharge notices for residents.  It systemically violates the law every time it discharges a resident.

8.      Within the last four years, Courtyard Care has unlawfully discharged hundreds of residents.

9.      Courtyard Care is part of a nursing home chain run by Defendant SavaSeniorCare, LLC and its inscrutable network of commonly owned and controlled affiliates, subsidiaries and shell entities ("Sava").

10.     Sava owns and operates six skilled nursing facilities in the State of California.  All of Sava's skilled nursing facilities in California are investor owned, and operated for-profit.  The facilities in the Sava chain pay Sava millions of dollars in "administrative" fees every year for, *inter alia*, "consulting" on compliance for the facilities.  Unsurprisingly, the other facilities in the Sava chain appear to follow the same policy of systemically violating the laws governing resident discharges as Courtyard Care.  As a result of these violations, thousands of residents have been illegally discharged, and all the residents at Defendants' facilities are in immediate danger of suffering cruel and irreparable injury.

11.     Plaintiffs bring this action on behalf of themselves and those similarly situated for an injunction prohibiting Defendants' unlawful business practices and for statutory damages of $500 per statutory violation for each resident unlawfully discharged within the last four years.

## JURISDICTION AND VENUE

12.     The Courts of the State of California have jurisdiction over this action pursuant to section 1430 of the California Health and Safety Code which allows enforcement in any court of

1  competent jurisdiction.  The California Superior Court has jurisdiction over this action pursuant to

2  section 10 of Article VI of the California Constitution which grants the Superior Court "original

3  jurisdiction in all cases except those given by statute to other trial courts."  The statutes under

4  which this action is brought do not grant jurisdiction to any other trial court.

5        13.    Venue is proper in Santa Clara County because Defendants' facility is located in this

6  county, the wrongful acts giving rise to the Plaintiffs' claims took place in this county, and

7  Plaintiffs suffered damages in this county.   Cal. Civ. Proc. Code §§ 395 and 395.5.

8  **THE PARTIES**

9        14.    Plaintiff Karen Mou is a former resident of Defendant Courtyard Care Center and

10  resident of San Jose, California.

11        15.    Plaintiff Anita Willis is a former resident at Defendant Courtyard Care Center and

12  resident of San Jose, California.

13        16.    Defendants are all part of the same commonly owned and operated chain of skilled

14  nursing facilities that is held in an impenetrable labyrinth of legal entities designed to hide money

15  and evade legal and tax obligations.  Each facility is, ostensibly, a separate limited liability

16  company.  However, on information and belief, Defendants are a commonly-owned unified

17  enterprise that has been disaggregated on paper to evade liability and tax and to commit fraud.

18  There is no legitimate business purpose for Defendants' structure; the purpose is to enrich the

19  owners at the expense of the residents.  C. Harrington, L. Ross and T. Kang, *Hidden Owners,*

20  *Hidden Profits, and Poor Nursing Home Care: a Case Study*, International Journal of Health Care

21  Services 45(4) 779 (2015) ("The chain's complex, interlocking individual and corporate owners

22  and property companies obscured its ownership structure and financial arrangements. Nursing and

23  support services expenditures were lower than nonprofits and administrative costs were higher than

24  for-profit non-chains.  The chain's nurse staffing was lower than expected staffing levels; its

25  deficiencies and citations were higher than in nonprofits … Profits were hidden in the chain's

26  management fees, lease agreements, interest payments to owners, and purchases from related-party

27  companies.").

28

17.     All Defendants are "managed" by Defendant SavaSeniorCare, LLC.  All the facilities are systematically understaffed to increase the profits of Sava's owners.  On information and belief, the individual facilities in the enterprise cross-subsidize one another through "related party payments" flowing through SavaSeniorCare, LLC and/or Defendant SSC Disbursement, LLC.  Defendants' owners enjoy the ill-gotten gains of systemic understaffing at all of Defendants' facilities – which at some facilities involves having 10 times less than the number of Registered Nurses ("RNs") that the facilities should have to ensure the health and safety of the residents therein.

18.     Sava is one of the five largest nursing home businesses in the nation, with annual total revenues reported at $1,290,000,000 in 2015.  Charlene Harrington, et al., *Marketization in Long-Term Care: A Cross-Country Comparison of Large For-Profit Nursing Home Chains*, 10 Health Service Insights 1, 17 (2017).  As explained in an academic study on the quality of care, which included Sava: "Registered nursing (RN) hours per resident day were significantly lower in Golden Living and SavaSeniorCare facilities than the national average." (*Id.* at 18.)  "With low staffing, it was not surprising that all the chains (except Golden Living) had significantly higher quality deficiencies than the national average during 2009-2014." (*Id.*)

19.     The United States Department of Justice joined a False Claims Act against Defendants and other Sava entities in 2015.  Because Defendants are a unified business enterprise (and a fraudulent one), the United States proceeded against all the facilities in the Sava chain, as well as Defendant SavaSeniorCare, LLC, even though the relators only worked at two of the Sava facilities.  In 2010, Sava paid an eight-figure settlement to the United States for making more false claims.

20.     Defendant SSC San Jose Operating Company LP, dba Courtyard Care Center ("Courtyard Care"), is a skilled nursing facility as defined in section 1250(c) of the California Health and Safety Code, and is therefore subject to section 1430(b) of that code.  It is located in San Jose, California and is part of the Sava chain.  Reports that it filed under penalty of perjury state that it paid Defendant SavaSeniorCare Administrative Services, LLC and Defendant SavaSeniorCare Consulting, LLC almost half a million dollars in 2016 for "management oversight"

1  and "back office services," and reported a related-party transaction with SSC Disbursement

2  Company, LLC, exceeding $4,000,000.

3        21.     Defendant SSC Pittsburg Operating Company LP, dba Diamond Ridge Healthcare

4  Center ("Diamond Ridge"), is a skilled nursing facility as defined in section 1250(c) of the

5  California Health and Safety Code, and is therefore subject to section 1430(b) of that code.  It is

6  located in Pittsburgh, California and is part of the Sava chain.  Reports that it filed under penalty of

7  perjury state that it paid Defendant SavaSeniorCare Administrative Services, LLC and Defendant

8  SavaSeniorCare Consulting, LLC almost a million dollars in 2016 for "management oversight" and

9  "back office services," and reported a related-party transaction of $10,876,771 with SSC

10 Disbursement Company, LLC, which is described as "receivables" from related parties.

11       22.     Defendant SSC Oakland Excell Operating Company LP, dba Excell Health Care

12 Center ("Excell") is a skilled nursing facility as defined in section 1250(c) of the California Health

13 and Safety Code, and is therefore subject to section 1430(b) of that code.  It is located in Oakland,

14 California and is part of the Sava chain.  Reports that it filed under penalty of perjury state that it

15 paid Defendant SavaSeniorCare Administrative Services, LLC and Defendant SavaSeniorCare

16 Consulting, LLC almost $700,000 dollars in 2016 for "management oversight" and "back office

17 services."  Defendant Excell also disclosed related-party transactions with SSC Disbursement

18 Company, LLC amounting to $11,662,564 and described as "payables."

19       23.     Defendant SSC Newport Beach Operating Company LP, dba Flagship Healthcare

20 Center ("Flagship") is a skilled nursing facility as defined in section 1250(c) of the California

21 Health and Safety Code, and is therefore subject to section 1430(b) of that code.  It is located in

22 Newport Beach, California and is part of the Sava chain.  Reports that it filed under penalty of

23 perjury state that it paid Defendant SavaSeniorCare Administrative Services, LLC and Defendant

24 SavaSeniorCare Consulting, LLC more than $750,000 in 2016 for "management oversight" and

25 "back office services."  Defendant Flagship also reported related-party transactions in which it paid

26 Defendant SSC Disbursement Company, LLC more than $4,800,000.

27       24.     Defendant SSC Carmichael Operating Company LP, dba Mission Carmichael

28 Healthcare Center ("Mission Carmichael") is a skilled nursing facility as defined in section 1250(c)

1  of the California Health and Safety Code, and is therefore subject to section 1430(b) of that code.

2  It is located in Carmichael, California and is part of the Sava chain.  Reports that it filed under

3  penalty of perjury state that it paid Defendant SavaSeniorCare Administrative Services, LLC and

4  Defendant SavaSeniorCare Consulting, LLC almost $700,000 in 2016 for "management oversight"

5  and "back office services."  Defendant Mission Carmichael also disclosed exchanging nearly

6  $900,000 with Defendant SSC Disbursement Company, LLC that year.

7      25.    Defendant SSC Tarzana Operating Company LP, dba Tarzana Health and

8  Rehabilitation Center ("Tarzana Health") is a skilled nursing facility as defined in section 1250(c)

9  of the California Health and Safety Code, and is therefore subject to section 1430(b) of that code.

10  It is located in Tarzana, California and is part of the Sava chain.  Reports that it filed under penalty

11  of perjury state that it paid Defendant SavaSeniorCare Administrative Services, LLC and

12  Defendant SavaSeniorCare Consulting, LLC over $800,000 in 2016 for "management oversight"

13  and "back office services."  Defendant Tarzana Health also reported paying Defendant SSC

14  Disbursement Company, LLC $1,316, 971 in 2016.

15      26.    Each of the six Sava owned skilled nursing facilities above (the "Facility

16  Defendants") has the same Governing Board Officers and Members: Michael Oxford, President

17  and Director, Michael Ruback, Vice President, Operations, and Wynn Sims, Secretary.

18      27.    All of the Sava Facilities are owned by California Holdco, LLC, which on

19  information and belief, is a holding company that maintains a 98.99% ownership interest in each of

20  the Facility Defendants.

21      28.    The Facility Defendants make various payments to Defendant SavaSeniorCare,

22  LLC.  But these are just payments to themselves because the companies are owned and controlled

23  by the same people, who operate the various companies as a single business for the unified purpose

24  of lining their pockets with money that should go to resident care and evading tax.

25      29.    The Sava chain is really a single, unitary business.  However, it is structured as a

26  convoluted series of limited liability and holding companies similar to the business structures that

27  nursing facility chains commonly use to evade liability and hide money.  *See*, *e.g*., "Untangling

28  Shlomo Rechnitz's Nursing Home Empire," *Sacramento Bee*, Nov. 6, 2014, available at

1  http://www.sacbee.com/news/investigations/nursing-homes/article3586406.html.  At this stage, it is

2  still unknown how many different commonly owned and controlled entities are part of the unified

3  Sava business.  Plaintiffs will amend the Complaint as necessary to include such entities as

4  discovery warrants.

5        30.     On information and belief, Defendant SavaSeniorCare, LLC is a limited liability

6  company that provides shared, centralized services, processes and resources for each of the Facility

7  Defendants, which may include without limitation: creating common, standardized policies for

8  each of the facility Defendants, tracking and responding to deficiencies found by the California

9  Department of Public Health ("DPH") for each of the facility Defendants, managing and

10  controlling compliance for each of the Facility Defendants, providing centralized management and

11  common personnel to instruct and/or advise the Facility Defendants on patient care and operations,

12  providing training for staff and/or management at the Facility Defendants, keeping centralized

13  information for all the Facility Defendants, creating and tracking performance analytics for the

14  Facility Defendants, performing payroll and HR functions for each of the Facility Defendants,

15  providing marketing strategies and public relations strategies for each of the Facility Defendants,

16  dealing with state licensing for each of the Facility Defendants, providing centralized accounting

17  for each of the Facility Defendants, preparing budgets for each of the Facility Defendants,

18  performing risk management for each of the Facility Defendants, providing common training and

19  resources for each Facility Defendant, performing centralized purchasing for the Facility

20  Defendants (and creating economies of scale), and providing common information technology for

21  each of the Facility Defendants.

22        31.     On information and belief, SavaSeniorCare, LLC wholly owns Defendant

23  SavaSeniorCare Administrative Services, LLC, which owns, operates, controls and/or provides

24  services to the skilled nursing facilities in the Sava chain in California and other states.

25        32.     On information and belief, Defendant SavaSeniorCare Consulting, LLC is a

26  Delaware limited liability company that owns, operates, controls and/or provides services to the

27  skilled nursing facilities in the Sava chain in California and other states.

28

33.     On information and belief, Defendant SSC Disbursement Company, LLC is a Delaware limited liability company that either directly or indirectly owns, operates, controls and/or provides services or capital to the skilled nursing facilities in the Sava chain in California and other states.

34.     The true names and/or capacities, whether corporate, individual, associate, or otherwise of DOES 1 through 10, inclusive, are unknown to Plaintiffs, who have therefore sued them by their fictitious names.  When their true names and/or capacities are ascertained, Plaintiffs will seek leave to amend this Complaint by inserting their true names and/or capacities.

35.     Plaintiffs are informed and believe and thereon allege that DOES 1 to 10 were responsible in some manner for the events and happenings set forth herein.  It shall be deemed that whenever and wherever in this Complaint any Defendant, whether specifically named or not, is the subject of any charging allegation, that DOES 1 to 10 are likewise the subject of that charging allegation.

36.     Each of the Defendants, including DOES 1 to 10, was the agent, servant, employee or principal of all the other Defendants, and in doing the things herein alleged was acting within the course and scope of such agency or employment and with the consent and permission of the remaining Defendants; and were operating together for a single, unified purpose.

37.     In addition to the above, SavaSeniorCare, LLC aided and abetted the Facility Defendants' flagrant disregard for federal and state laws meant to protect vulnerable nursing home residents.

## FACTS

### A.     The Dumping Epidemic

38.     Dumping is one of the worst dangers faced by skilled nursing facility residents.  To maximize profits, nursing facilities often evict the poorest and neediest residents.  When a facility believes it can replace the resident with someone who will pay more, is less of a payment risk, or requires less staff time to care for, facilities illegally discharge residents.  *See*, *e.g.*, W. Pipal, *You Don't Have To Go Home But You Can't Stay Here: The Current State Of Federal Nursing Home Involuntary Discharge Laws*, 20 Elder L.J. 235 (2012).

39.     In 1987, Congress passed the Nursing Home Reform Act, which gave residents the substantive right not to be discharged from their homes except on narrow statutory grounds, and procedural rights to notice and a fair hearing before being discharged.  Skilled nursing facilities, including the Facility Defendants, have nonetheless sought to unlawfully circumvent these resident protections.

40.     Because the financial incentives are high and enforcement is lax, resident dumping has become commonplace.  This unlawful phenomenon has been documented both in California and across the nation.  *See*, *e.g*., Theo Francis, To Be Old Frail and Evicted: Patients at Risk, WALL STREET JOURNAL (Aug. 7, 2008), available at http://canhr.org/newsroom/canhrnewsarchive/2008/WallStreetJourn20080807.pdf; California Nursing Home Evictions On The Rise, CBS News (Aug. 11, 2011), available at http://sanfrancisco.cbslocal.com/2011/08/01/some-bay-area-nursinghomes-kicking-out-hospitalized-patients/; Ina Jaffe, Nursing Home Evictions Strand the Disabled In Costly Hospitals, NPR (Feb. 25, 2016), available at https://www.npr.org/sections/health-shots/2016/02/25/467958665/nursing-homeevictions-strand-the-disabled-in-costly-hospitals; Matt Sedensky, Nursing Homes Turn to Eviction to Drop Difficult Patients, AP NEWS (May 8, 2016), available at https://www.apnews.com/95c33403b5024b4380836d3ed3dfecb0; Carlo Calma, Lawsuit Alleges Improper Discharges at CA SNFs, SKILLED NURSING NEWS (Nov. 20, 2017), available at https://skillednursingnews.com/2017/11/lawsuit-allegesgrowing-trend-improper-discharges-ca-snfs/.

**B.     Defendants Dump Ms. Willis**

41.     Plaintiff Anita Willis was admitted as a resident to Defendant Courtyard Care on March 5, 2017.

42.     Shortly before her admission, she had suffered from a brain aneurysm and stroke. She also had a duodenal ulcer, difficulty walking, muscle weakness, gastritis, anemia, hypertensive heart disease, chronic kidney disease, pain, dizziness and post-concussive syndrome.

43.     On April 5, 2017, without warning, facility personnel repeatedly told her that she had to leave the facility and that she had no choice.  She was not examined by a physician or

otherwise medically cleared to leave.  Ms. Willis told the facility staff that she did not feel ready to

be discharged in that she was still experiencing dizziness and symptoms associated with post-

concussive syndrome, and was having trouble walking.  She also told facility staff that she had

little money and nowhere to go.

44.     Courtyard Care did not follow any of the mandated statutory discharge procedures.

It did not give Ms. Willis any advance written notice that she was going to be discharged.  It did

not prepare her for her discharge.  It did not advise her of her right to stay in the facility and to

appeal the decision to discharge her.  It did not tell her of her right to consult an ombudsperson.

And it did not provide her with a sufficient post-discharge plan of care.

45.     In reliance on the facility's false representations that she had no choice but to leave,

and without proper orientation or medical clearance, Ms. Willis left the facility.  She spent all her

money securing lodging in a motel for two nights.  Ms. Willis was then homeless and in urgent

need of nursing care.  Shortly thereafter, she began suffering internal bleeding and was hospitalized

for emergency surgery.

**C.     Defendants Dump Ms. Mou**

46.     Plaintiff Karen Mou was admitted as a resident of Courtyard Care on January 16,

2015 for rehabilitation after she was hit by a car as a pedestrian.  She suffered from a lower femur

fracture, fracture of the upper end of the fibula and tibia, fracture of her lumbar vertebra, fracture of

her sternum, thoracic aorta injury, liver injury, other pulmonary embolism and infarction, acute

venous embolism and thrombosis of deep vessels of distal lower extremity, intercranial injury and

hypertension.

47.     On March 28, 2015, Courtyard Care told Ms. Mou that she had to leave.  Ms. Mou

had not been examined by a doctor and was not properly oriented.  She was barely able to walk

with the help of a four-wheeled walker.  In reliance on Courtyard Care's false representations that

she had to leave, she reluctantly left.

48.     Courtyard Care did not provide Ms. Mou with a 30-days' written notice of her discharge.  The facility did not notify her of her right to appeal and her right to remain in the facility while such appeal was pending.  Nor did the facility inform Ms. Mou of her right to talk to an ombudsman, who could have advised Ms. Mou of her legal rights.

49.     After being evicted, Ms. Mou requested a hearing before the California Department of Health Care Services ("DHCS").  The State ruled in Ms. Mou's favor, and found that Defendants had illegally discharged Ms. Mou.

**D.     Defendants' Pattern of Unlawful Conduct**

50.     According to data Courtyard Care submitted to the government under penalty of perjury, Defendant Courtyard Care has discharged roughly 400 residents within the last four years.[1]

51.     Courtyard Care has testified under penalty of perjury as follows:

Q:     Do you issue transfer/discharge notices for any of your short-term residents?

A:     No.  No.

Q:     Okay.  That's part of your policy not to?

A:     Yes.

52.     According to data the remaining Facility Defendants have submitted to the government under penalty of perjury, the Facility Defendants have discharged roughly 4,100 residents within the last four years.

53.     On information and belief, all the facilities in the Sava chain follow the same unlawful policy in place at Courtyard Care.  As a result, each of the Defendants is, and has been, systemically violating the law.

54.     Defendants acted with malice, oppression, or fraud and knowingly violated and acted with conscious disregard of Plaintiffs' rights.

---

[1] Data for 2017 has not been posted, and the data cannot be subdivided by month, so only rough estimates are available.

1

## CLASS ALLEGATIONS

2      55.    This action is brought on behalf of Plaintiffs and all similarly situated individuals

3 who were discharged from one of the facilities owned, managed and/or operated by Defendants

4 from four years from the date this action is filed through such time as class notice is given.

5      56.    The number of Class members is so large that the joinder of all its members is

6 impracticable.  The exact number of Class members can be determined from information in the

7 possession and control of the Defendants, but based on public records, the number of class

8 members is in the thousands.

9      57.    Plaintiffs' claims are typical of the claims of the members of the Class, as Courtyard

10 Care failed to follow any of the correct procedures for discharging them and has admitted under

11 oath that it has a "policy" of never following such procedures, and the remaining Sava facilities, on

12 information and belief, follow the same policy.

13      58.    Plaintiffs are adequate representatives of the Class and will fairly and adequately

14 protect the interest of the Class.  Plaintiffs' interests are not antagonistic to or in conflict with the

15 interests they seek to represent as Class representatives.

16      59.    Plaintiffs' counsel is experienced in prosecuting class actions, is committed to

17 improving conditions in nursing facilities, and intends to prosecute this action vigorously.

18      60.    Numerous common issues of law and fact exist and predominate over questions

19 affecting only individual members.  These issues include, without limitation:

20                a)    Whether the facilities commonly owned, managed, controlled and/or

21                      operated by Defendants have a pattern and/or practice of violating 42 USC §

22                      1395i-3(c)(2)(B)(i)(I);

23                b)    Whether the facilities commonly owned, managed, controlled and/or

24                      operated by Defendants have a pattern and/or practice of violating 42 USC §

25                      1396r(c)(2)(B)(i)(II);

26                c)    Whether the facilities commonly owned, managed, controlled and/or

27                      operated by Defendants have a pattern and/or practice of violating 42 USC

28                      § 1396r(c)(2)(B)(i)(III);

d)     Whether the facilities commonly owned, managed, controlled and/or operated by Defendants have a pattern and/or practice of violating 42 USC § 1396r(c)(2)(B)(ii);

e)     Whether the facilities commonly owned, managed, controlled and/or operated by Defendants have a pattern and/or practice of violating 42 CFR § 483.15(c)(2);

f)     Whether the facilities commonly owned, managed, controlled and/or operated by Defendants have a pattern and/or practice of violating 42 CFR § 483.15(c)(3);

g)     Whether the facilities commonly owned, managed, controlled and/or operated by Defendants have a pattern and/or practice of violating 42 CFR § 483.15(c)(4);

h)     Whether the facilities commonly owned, managed, controlled and/or operated by Defendants have a pattern and/or practice of violating 42 CFR § 483.15(c)(5);

i)     Whether the facilities commonly owned, managed, controlled and/or operated by Defendants have a pattern and/or practice of violating 42 CFR § 431.210;

j)     Whether the facilities commonly owned, managed, controlled and/or operated by Defendants have a pattern and/or practice of violating 22 CCR § 72527(a)(5);

k)     Whether the facilities commonly owned, managed, controlled and/or operated by Defendants have a pattern and/or practice of violating 22 CCR § 72527(a)(6);

l)     Whether the facilities commonly owned, managed, controlled and/or operated by Defendants have a pattern and/or practice of violating 22 CCR § 72527(a)(7);

FIRST AMENDED COMPLAINT

1             m)      Whether the facilities commonly owned, managed, controlled and/or

2                     operated by Defendants have a pattern and/or practice of violating California

3                     Health and Safety Code § 1418.81;

4             n)      Whether the facilities commonly owned, managed, controlled and/or

5                     operated by Defendants have a pattern and/or practice of violating California

6                     Welfare and Institution Code § 14124.7;

7             o)      Whether Defendants are commonly owned, operated, controlled and/or

8                     managed, and acting as a unified enterprise;

9             p)      Whether the discharge policies followed by Defendants are unlawful;

10           q)      Whether the facilities commonly owned, managed, controlled and/or

11                 operated by Defendants should be enjoined from violating the

12                 aforementioned rules and regulations;

13           r)       Whether the facilities commonly owned, managed, controlled and/or

14                 operated by Defendants should be required to take remedial action to correct

15                 their policies, procedures and/or actual practices related to discharges;

16           s)       Whether further relief, including an independent monitor, is necessary to

17                 prevent Defendants' ongoing violations of the laws detailed above.

18      61.     Defendants have acted or refused to act on grounds that apply generally to the class,

19 so that final injunctive relief is appropriate respecting the class as a whole.

20      62.     Absent certification of a class, the equitable relief sought by Plaintiffs will create the

21 possibility of inconsistent judgments and/or obligations among the facilities commonly owned,

22 managed and/or operated by Defendants.

23      63.     A class action is also superior to other available methods for the fair and efficient

24 adjudication of this controversy.  Requiring Class members to pursue their claims individually

25 would invite a host of separate suits, with concomitant duplication of costs, attorneys' fees, and

26 demands on judicial resources.  Furthermore, as the damages suffered by the individual members of

27 the Class may be relatively small, the expense and burden of individual litigation make it

28 impracticable for the members of the Class individually to seek redress of the wrongs perpetrated

1   by Defendants.  Plaintiffs know of no difficulty that could be encountered in the management of

2   this litigation that would preclude its maintenance as a class action.

3                                   **CAUSES OF ACTION**

4                                   **First Cause of Action**
                               **(Violation of Health and Safety Code § 1430(b))**

5       64.     Plaintiffs incorporate the previous paragraphs as though fully set forth herein.

6       65.     Section 1430(b) of the California Health and Safety Code states that "[a] current or

7   former resident or patient of a skilled nursing facility, as defined in subdivision (c) of section 1250

8   . . . may bring a civil action against the licensee of a facility who violates any of the rights of the

9   resident or patient as set forth in the Patient Bill of Rights in section 72527 of Title 22 of the

10  California Code of Regulations ("C.C.R."), or any other right provided for by federal or state law

11  or regulation. The suit shall be brought in a court of competent jurisdiction.  The licensee shall be

12  liable for the acts of the licensee's employees.  The licensee shall be liable for up to five hundred

13  dollars ($500), and for costs and attorney fees, and may be enjoined from permitting the violation

14  to continue … "

15      66.     Section 1430(b) was created to provide private regulatory enforcement of resident

16  rights.  For this reason, as Defendants know, Courts have an unflagging obligation to adjudicate

17  § 1430(b) claims.  *Shuts v. Covenant Holdco LLC*, 208 Cal. App. 4th 609, 623-24 (2012) ("by

18  enacting section 1430, subdivision (b), the Legislature specifically authorized skilled nursing

19  facility residents themselves to bring actions to remedy violations of their rights.... Therefore, it

20  would frustrate the main purpose of section 1430, subdivision (b) to conclude that courts should

21  abstain from adjudicating claims under this statute...."); *McCrae by and through Watters v. HCR*

22  *Manor Care Servs., LLC*, 691 Fed. Appx. 476, 477-78 (9th Cir. 2017)  ("Even accepting Manor

23  Care's assumption that state law abstention principles are pertinent in this state law case that has

24  come under federal diversity jurisdiction, the district court did not err in adjudicating this case.

25  Abstaining from adjudicating MacRae's claims would frustrate the policy of the California

26  legislature in explicitly authorizing private suits for statutory damages from residents of

27  understaffed facilities").

28

67.     As alleged above, Defendants violated many of Plaintiffs' rights under the California Patients' Bill of Rights and rights provided by other state and federal laws or regulations.  The specific rights, laws and regulations Defendants violated include at least the following provisions from the California Patients' Bill of Rights:  22 CCR § 72527(a)(6); 22 CCR § 72527(a)(4); 22 CCR § 72527(a)(7); 22 CCR § 72527(a)(10); 22 CCR § 72527(a)(12). Defendants also violated at least the following California statutory provisions:  California Health and Safety Code § 1418.81; California Welfare and Institution Code § 14124.7, and at least the following federal laws and regulations: 42 CFR § 483.15; 42 USC § 1395i-3(c)(2)(B)(i)(I); 42 USC § 1396r(c)(2)(B)(i)(II); 42 USC § 1396r(c)(2)(B)(i)(III); 42 USC § 1396r(c)(2)(B)(ii); 42 CFR § 483.15(c)(2); 42 CFR § 483.15(c)(3); 42 CFR § 483.15(c)(4); 42 CFR § 483.15(c)(5); and 42 CFR § 431.210.

68.     Defendants violated Plaintiffs' rights "To receive all information that is material to an individual patient's decision concerning whether to accept or refuse any proposed treatment or procedure," 22 C.C.R. § 72527(a)(6), by *inter alia*, discharging them without providing them at least the following information:  that they had a right to stay, a right to consult an ombudsman, a right to be medically evaluated before being discharged, and a right to have any question about having insurance coverage issues regarding payment for their residency fully and finally resolved. Defendants did not provide Plaintiffs any of the following information because they were trying to dump Plaintiffs out of the facility for their own economic benefit.

69.     Defendants violated Plaintiffs' rights "[t]o be transferred or discharged only for medical reasons, or the patient's welfare or that of other patients or for nonpayment for his or her stay and to be given reasonable advance notice to ensure orderly transfer or discharge. Such actions shall be documented in the patient's health record."  22 C.C.R. § 72527(a)(6).  As alleged above, Defendants violated this statute in numerous ways, including by discharging Plaintiffs without reasonable advance notice to ensure orderly transfer of discharge and without documenting such actions in their medical charts.

70.     Defendants discharged Plaintiffs without following the legal requirements for doing so, *e.g.*, providing 30-days' written notice, helping find them a new place to live, and making sure

that they were properly prepared and oriented. 42 CFR § 483.15(c)(3); 42 U.S.C. § 1395i-3(c)(2)(B)-(C). The statutory discharge procedures are ironclad and do not involve balancing anything.  There is only one lawful way for a skilled nursing facility to discharge a resident: the facility must give the resident 30-days' notice, help find an alternative place to live, document the reasons for the transfer in the resident's medical chart, and provide "sufficient preparation and orientation to residents to ensure safe and orderly transfer or discharge from the facility."  42 U.S.C. § 1395i-3(c)(2)(B), (C); *St. John of God Retirement & Care Ctr. v. Dep't of Health Care Servs. Office*, 2 Cal. App. 5th 638, 653-57 (2016).  Thus even if a facility contends that a resident is a danger to herself or others (which Defendants do not assert here), it nonetheless must initiate discharge proceedings and follow all the legal steps for discharge; it cannot cast the resident out into the streets. *Id.*

71.    Through the conduct alleged above, Defendants deprived Plaintiffs of their rights to "consent to or refuse any treatment or procedure" under 22 C.C.R. § 72527(a)(4), for at least the reasons given above.  Plaintiffs could not meaningfully "consent" to being discharged without being informed of the panoply of rights they have against being discharged against their will, such as their right to remain living in the facility while they appeal the propriety of their discharge in an administrative proceeding before the California Department of Health Care Services, and including all the various other rights noted above and below.

72.    Through the conduct alleged above, Defendants deprived Plaintiffs of their rights to "be encouraged and assisted throughout the period of her stay to exercise rights as a patient and a citizen, and to this end voice grievances and recommend changes in policies and services to facility staff and/or outside representatives of the patient's choice, free from restraint, interference, discrimination or reprisal." 22 C.C.R. § 72527(a)(7); 42 C.F.R. § 483.10(b)(1).  Defendants violated these provisions because, among other things, Defendants did not encourage Plaintiffs to exercise their rights to appeal while they were living at the facility, did not encourage Plaintiffs to consult an ombudsman, and did not follow any of the other statutory procedures to inform and guide Plaintiffs exercising their rights.  To the contrary, Defendants deliberately sought to prevent Plaintiffs from exercising their rights to appeal while they continued to live at the facility and the

1  various other rights noted above and below.

2      73.    Defendants deprived Plaintiffs of their rights to "be free from mental and physical

3  abuse," as illegally dumping them onto the streets when they were not medically cleared to leave

4  was physically and mentally cruel, abusive and life-threatening. 22 C.C.R. § 72527(a)(10).  For

5  clarity, this claim does not depend or rely on Welf. & Inst. Code § 15610.63, which governs claims

6  for elder abuse, which is a different statutory tort.

7      74.    Through the conduct above, Defendants' illegal treatment of Plaintiffs violated 22

8  C.C.R. § 72527(a)(12), which requires all nursing home residents "to be treated with consideration,

9  respect and full recognition of dignity and individuality …."  *Id*.; 42 C.F.R. § 483.10(a)(3).

10     75.    Through the conduct above, Defendants violated California Welfare and Institutions

11 Code § 14124.7, which provides, *inter alia*, "No long-term health care facility participating as a

12 provider under the Medi-Cal program shall seek to evict out of the facility or, effective January 1,

13 2002, transfer within the facility, any resident as a result of the resident changing his or her manner

14 of purchasing the services from private payment or Medicare to Medi-Cal … This section also

15 applies to residents who have made a timely and good faith application for Medi-Cal benefits and

16 for whom an eligibility determination has not yet been made."

17     76.    Through the conduct above, Defendants violated California Health & Safety Code

18 § 1418.81, which requires facilities to evaluate a resident's discharge potential.  By discharging

19 Plaintiffs without evaluating their medical conditions, and failing to document such conditions in

20 Plaintiffs' records, Defendants at least violated subpart (a) of § 1418.81:  "The assessment shall

21 include whether the resident has expressed or indicated a preference to return to the community and

22 whether the resident has social support, such as family, that may help to facilitate and sustain return

23 to the community.  The assessment shall be recorded with the relevant portions of the minimum

24 data set, as described in Section 14110.15 of the Welfare and Institutions Code. The plan of care

25 shall reflect, if applicable, the care ordered by the attending physician needed to assist the resident

26 in achieving the resident's preference of return to the community."  Defendants also violated

27 subpart (b) of § 1418.81: "The skilled nursing facility shall evaluate the resident's discharge

28 potential at least quarterly or upon a significant change in the resident's medical condition,"

because it never had a doctor see Plaintiffs to evaluate their medical conditions and whether they were medically fit to discharge.  By, *inter alia*, kicking Plaintiffs out of their facility into the streets without any discharge planning and without statutory discharge notices, Defendants also violated subpart (d) of this statute, which states that "If return to the community is part of the care plan, the facility shall provide to the resident or responsible party and document in the care plan the information concerning services and resources in the community. That information may include information concerning: (1) In-home supportive services provided by a public authority or other legally recognized entity, if any. (2) Services provided by the Area Agency on Aging, if any. (3) Resources available through an independent living center. (4)  Other resources or services in the community available to support return to the community." By, *inter alia*, discharging Plaintiffs without having them actually seen and evaluated by a physician, Defendants also violated subpart (e) of this statute, which provides: "If the resident is otherwise eligible, a skilled nursing facility shall make, to the extent services are available in the community, a reasonable attempt to assist a resident who has a preference for return to the community and who has been determined to be able to do so by the attending physician, to obtain assistance within existing programs, including appropriate case management services, in order to facilitate return to the community. The targeted case management services provided by entities other than the skilled nursing facility shall be intended to facilitate and sustain return to the community."

## Second Cause of Action
### (Violation of California Business & Professions Code §§ 17200 *et seq*.)

77.    Plaintiffs incorporate the previous paragraphs as though fully set forth herein.

78.    Defendants' conduct alleged herein is unlawful, fraudulent and/or unfair.

79.    Plaintiffs have lost money or property as a result of Defendants' unlawful, fraudulent and/or unfair conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court issue the following relief:

A.      Equitable relief, including without limitation, an injunction prohibiting Defendants from wrongfully discharging residents and appointment of a monitor to ensure Defendants stop violating the law;

B.      Statutory damages of $500 per each right violated for each of the Plaintiffs and for each member of the Class;

C.      Punitive damages;

D.      Attorney's fees and costs; and

E.      All such other and further relief as the Court may deem just, proper, and equitable.

Dated:  April 18, 2018                              BRAUNHAGEY & BORDEN LLP


                                                   By:    */s/ Matthew Borden*
                                                          Matthew Borden

                                                   Attorneys for Plaintiffs Anita Willis, Karen Mou
                                                   and those similarly situated

FIRST AMENDED COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs hereby demand a jury trial of all claims and causes of action triable before a jury.

3

Dated:  April 18, 2018                                    BRAUNHAGEY & BORDEN LLP

4

5

By:    */s/ Matthew Borden*

6                                                                          Matthew Borden

7                                                   Attorneys for Plaintiffs Anita Willis, Karen Mou
                                                      and those similarly situated

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28